UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEVIN A. WARD, SR. and
PAMELA WARD, individually
and as Administrators of the
Estate of Kevin A. Ward, Jr.,
deceased,

                          Plaintiffs,


             -v-                                    7:15-CV-1023

ANTHONY WAYNE STEWART,

                          Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTHONY WAYNE STEWART,

                     Counter-Claimant,


             -v-

KEVIN A. WARD, SR. and
PAMELA WARD, individually
and as Administrators of the
Estate of Kevin A. Ward, Jr.,
deceased,

                     Counter-Defendants.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                          OF COUNSEL:

THE LANIER LAW FIRM                   JUDSON A. WALTMAN, ESQ.
Attorneys for Plaintiffs              BENJAMIN T. MAJOR, ESQ.
6810 FM 1960 Road West
Houston, TX 77069

THE LANIER LAW FIRM                          EVAN M. JANUSH, ESQ.
Attorneys for Plaintiffs                     RICHARD D. MEADOW, ESQ.
126 East 56th Street, 6th Floor              WILLIAM M. LANIER, ESQ.
New York, NY 10022                           ZARAH LEVIN-FRAGASSO, ESQ.

WOODS OVIATT GILMAN LLP                      BRIAN D. GWITT, ESQ.
Attorneys for Defendant
350 Main Street, Suite 1900
Buffalo, NY 14202

ICE MILLER LAW FIRM                          ANGELA P. KRAHULIK, ESQ.
Attorneys for Defendant                      ELIZABETH N.J. TIMME, ESQ.
One American Square, Suite 2900              ERIC J. MCKEOWN, ESQ.
Box 82001                                    RICHARD A. SMIKLE, ESQ.
Indianapolis, IN 46282

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

### I. INTRODUCTION

On August 7, 2015, plaintiffs Kevin A. Ward, Sr. ("Mr. Ward") and Pamela Ward ("Mrs. Ward") (collectively "plaintiffs") filed this wrongful death action in Supreme Court, Lewis County, against defendant Anthony Wayne Stewart ("Stewart" or "defendant"), a race car driver who struck and killed their son, Kevin A. Ward, Jr. ("Ward Jr.").

The fatal crash occurred on August 9, 2014, during an evening sprint car event being held at Canandaigua Motorsports Park ("CMP"), a dirt racetrack in Canandaigua, New York. According to plaintiffs' four-count complaint, Stewart caused the on-track collision by improperly maneuvering his vehicle toward Ward Jr., a fellow driver, after race officials signaled for caution on the track.

On August 21, 2015, Stewart removed plaintiffs' civil suit to federal court and asserted a counterclaim for indemnification based on two liability releases that all participants,

including defendant and Ward Jr., were supposed to sign off on before racing at CMP that night.  After removal, defendant moved to transfer the action to the United States District Court for the Western District of New York, Rochester Division.  That motion was denied on September 29, 2015, Ward v. Stewart, 133 F. Supp. 3d 455 (N.D.N.Y. 2015), and the parties proceeded to discovery.

On March 28, 2017, with fact discovery closed, Stewart moved pursuant to Federal Rule of Civil Procedure ("Rule") 56 seeking partial summary judgment on plaintiffs' claims.[1]  According to defendant, (1) plaintiffs' negligence-based theories of relief are barred by the effect of the two liability releases or, alternatively, by the common law doctrine of primary assumption of risk; and (2) there is no evidence from which a reasonable jury might conclude that Ward Jr. suffered damages in the form of either pre-impact terror or post-impact conscious pain and suffering.

On April 11, 2017, plaintiffs opposed Stewart's motion and cross-moved for partial summary judgment on defendant's indemnification counterclaim.  According to plaintiffs, the two liability releases on which defendant's counterclaim relies are either inapplicable due to the particular facts of this case or wholly unenforceable as a matter of state law.

The parties' motions were fully briefed and oral argument was heard on Friday, October 27, 2017 in Utica, New York.  Decision was reserved.

## II.  BACKGROUND

The collision that cost Ward Jr. his life took place at an event sponsored by Empire Super Sprints ("ESS"), a racing organization that puts together "sprint car" races for its

---

[1] Stewart did not challenge plaintiffs' claims alleging reckless or intentional conduct.

members at race locations all over the northeast.[2]  Sprint cars are a kind of winged vehicle with "staggered" rear tires that is customarily driven counterclockwise on a banked circular track composed of either dirt or pavement.  Because of these factors and other aspects of their design, sprint cars tend to "pull" to the left absent contrary steering input from the driver.

On this occasion, ESS obtained use of racing facilities from CMP owner/operator Jeremie Corcoran ("Corcoran"), who paid ESS a flat fee to host its August 9 race at the Canandaigua track.  As a result of this shared arrangement, ESS and CMP maintained separate liability releases that each organization expected participants to sign before venturing out onto the racecourse.

ESS typically provided the first of these releases as part of a yearly membership form it distributed to race car drivers, team owners, and other enthusiasts in advance of that year's schedule of sprint racing events (the "ESS Release").  As relevant here, a portion of Section Two of the ESS Release explained that:

> In consideration of being permitted to join *Empire Super Sprints, Inc.* (hereinafter called "*ESS*") and being permitted to participate in or be a spectator at *Empire Super Sprints, Inc.* membership events during 2014 I hereby:
>
> 1.  Release, waive, discharge, and promise not to sue *ESS*, any of it's [*sic*] officials, any of its members, any of it's [*sic*] sponsors, or car owners, drivers, pit crews, for personal injury or property damage which I sustain during 2014 arising out of an *ESS* event, whether my loss is caused by the negligence of *ESS* or it's [*sic*] members.  This does not waive rights of suit in the event that an action is termed criminal within the jurisdiction of applicable law.

---

[2]  Some of these racing organizations, like ESS, are geographically limited.  Others, like the World of Outlaws Craftsman Sprint Car Series, sponsor races across the country.

2.      Agree to indemnify and hold harmless *ESS*, its officials and members for any loss, liability, damage, or cost which may incur due to my presence at an *ESS* event, whether I am competing, officiating, or observing an *ESS* event.

3.      Assume the risks inherent in automobile racing and assume responsibility for the bodily injury or property damage which those risks can cause.

The second release at issue in this case is a separate "insurance form" that Corcoran required all participants to sign before each race (the "CMP Release"). This document explained in relevant part that:

In consideration of being permitted to compete, officiate, observe, work for, or participate in any way in the Event(s) pr being permitted to enter for any purpose any restricted area (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), I, the undersigned, for myself, my personal representatives, heirs, and next of kin:

. . . .

3.      Hereby release, waive, discharge and covenant not to sue the promoters, participants, [or others] . . . from all liability to the undersigned . . . for any and all loss or damage, and any claim or demands therefor on account of injury to the undersigned's person or property or resulting in death of the undersigned arising out of or related to the event(s), whether caused by the negligence of the releasees or otherwise.

4.      Hereby agree to defend, indemnify and save and hold harmless the Releasees and each of them from any loss, liability, damage or cost they may incur due to claims brought against the releasees arising out of or related to the undersigned's injury or death from the event(s) whether caused by the negligence of the releasees or otherwise.

> 5.    Hereby assume full responsibility for any risk of bodily injury, death or property damage arising out of or related to the event(s) whether caused by the negligence of releasees or otherwise.

Despite the strong words of warning included in both the ESS Release and the CMP Release (collectively the "Releases"), it is unlikely that either Stewart or Ward Jr. needed to be reminded of the dangers—the August 9 sprint car race was a far cry from being either driver's first time around a race track.

Both drivers had enthusiastically pursued the sport since childhood.  Stewart first became involved in 1979, racing go-karts with the encouragement of his father, himself a hobbyist racer, from the ages of eight to about eighteen.  After high school, defendant progressed from racing go-karts to "three-quarter midgets," a type of four-cylinder race car described in the record as a much smaller version of a sprint car.

Over the years, Stewart continued to race increasingly powerful cars against increasingly skilled fields of opponents while he worked a series of odd jobs—sealing parking lots at night, driving a tow truck, and even working at McDonald's—to make ends meet.  In fact, just before making the leap to professional auto racing, he spent his early twenties traveling around the country racing in sprint car competitions.

In 1995, Stewart ascended to the "pinnacle" of the sport:  NASCAR.  As he explained in his deposition, NASCAR is a "stock car racing league" where participants drive a "3,300 pound full-bodied car."  Defendant enjoyed phenomenal success as a professional driver in

both NASCAR's "Cup Series," the racing equivalent of a professional football or baseball league, and its "Xfinity Series," one level of competition below that.[3]

All of these professional achievements meant that an ESS-sponsored sprint car event like the one being held in Canandaigua on August 9 had become just a sort of "hobby" or "recreational activity" that Stewart, by then a seasoned professional driver known for having a legendary temper, attempted to squeeze into his busy schedule whenever the chance arose.

If it had not been cut short at just twenty years, the arc of Ward Jr.'s racing career might have one day ended up looking much the same.  Just like Stewart, Ward Jr. began at a young age racing go-karts with the support and encouragement of his father.  And much like defendant, he progressed into larger classes of vehicles over the course of the ensuing decade, getting an early jump on sprint car racing during his late teenage years.

Ward Jr.'s sprint car experience came at an annual cost of between $40,000 and $80,000, a sum which Mr. Ward funded through the family's painting business and his associated personal and professional relationships.  In return, the racing team—owned by Mr. Ward, not his son—cleared about $10,000 to $15,000 a year in prize money while Ward Jr., who lived at home and paid no rent, received a weekly salary from the family business in exchange for his help as a jack-of-all-trades.

On August 9, 2014, Stewart and Ward Jr. joined nearly two dozen other drivers for the final race of the ESS sprint car event being held at CMP that evening.[4]  Racing conditions

---

[3] Stewart's professional career also included IndyCar, a style of racing where participants drive "1,600 pound open-wheel cars with a nose and rear wing."  Although this form of racing is popular in Europe, opportunities to compete at IndyCar's highest level—Formula One—remain limited in the United States.

[4] Plaintiffs have submitted three videos of the sprint car race, two of which depict the collision between Stewart's race car and Ward Jr.

were considered good that night:  the dirt track was "smooth and slick," with no sign of any rain or other weather issues.

During one of the early laps of the race, Stewart passed Ward Jr. using an aggressive maneuver known as a "slide job," forcing Ward Jr.'s sprint car to crash into the outside wall of the race course.  As defendant explained in his deposition, a slide job occurs "when a car is running the high side of the racetrack and you're trying to pass them, you'll drive to the bottom of the track and then slide up in front of them."  Ward Jr.'s disabled car came to rest near the "high" side, or the outside edge, of the banked dirt track.

Race officials reacted immediately by waving yellow caution flags, activating yellow caution lights around the course, and alerting drivers over their in-car radio systems that the racetrack was under a "caution" period as a result of Ward Jr.'s crash.  During this caution, racers were also instructed to continue driving at a lower, "idle" speed and to "stay low" on the track—away from where Ward Jr. and his disabled vehicle were now located.

While the remaining race participants, including Stewart, continued to drive around the track under caution, Ward Jr. exited his race car and proceeded on foot a short ways down the banked area of the track toward the middle of the driving lane.  According to Jessica Zemken-Friesen, one of the other drivers in the race, she observed Ward Jr. "gesturing towards" Stewart's vehicle with obvious displeasure, presumably faulting defendant for causing him to lose control of his own race car.  Another driver, Chuck Hebing, also saw Ward Jr. standing on the track during this caution period and swerved to avoid him.

Stewart, however, did not.  From her vantage point in the driver's seat of the vehicle behind defendant's race car, Zemken-Friesen observed defendant turn the front wheels of his sprint car to the right and then "hit the throttle" as he approached Ward Jr.'s position on

the track, a maneuver which sent defendant's 1,400 pound race car sideways and into Ward Jr.'s body. Defendant, for his part, claims that this maneuver was not malicious but rather a last-ditch attempt to avoid disaster in the split second that he realized a person was standing in his path on the racetrack. In either case, defendant struck Ward Jr. with his sprint car, causing injuries that proved fatal.

## III.  **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Where, as here, the parties have cross-moved for summary judgment, a reviewing court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.) (citation omitted).

In undertaking this analysis, it bears noting that "a district court is not required to grant judgment as a matter of law for one side or the other." Marcano, 38 F. Supp. 3d at 246 (citation omitted); see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co., 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.").

## IV.  DISCUSSION

### A.  The Releases

As an initial matter, Stewart contends the liability releases insulate him from plaintiffs' negligence-based claims. In fact, defendant argues these documents actually entitle him to indemnification from plaintiffs for the expense of having to defend himself from those claims

in the first place.  According to defendant, he, Ward Jr., and Mr. Ward executed both Releases and therefore defendant, as a fellow ESS "member" and a fellow CMP event "participant" within the meaning of those two agreements, is clearly released from liability.

Plaintiffs deny that Stewart was an ESS "member" at the time of the collision and assert that the particular version of the CMP Release defendant signed does not bar their claims against him.  As for the ESS Release, plaintiffs argue that ESS organizers often mishandled membership paperwork and suggest that defendant may not have even signed this release until *after* the deadly accident occurred.  As for the CMP Release, plaintiffs point out that the version of the release bearing defendant's signature differs from the version signed by Ward Jr. and Mr. Ward.

Stewart replies that plaintiffs' attempts to cast doubt on when he signed the Releases are beside the point because it is undisputed that Ward Jr. and Mr. Ward properly signed the ESS Release.  According to defendant, that document alone insulates from liability not only other ESS "members," but also any other "car owners [or] drivers," a category into which defendant and Ward Jr. certainly fell during the August 9 race.

After reviewing all of these documents, it is clear that plaintiffs' doubts about the validity of the Releases are well-founded.  Take for example the individual ESS Releases signed by Ward Jr. and Mr. Ward.  Each of these forms bear a signature on the appropriate line in Section Two that matches the printed name of the individual in Section One, and both are dated January 13, 2014, months before the start of the ESS racing season.  In contrast, the ESS Release belonging to Stewart is dated for August 9, the day of the race in question.  And while this document includes defendant's printed name in Section One, it

actually bears the signature of "Jimmy Carr," defendant's crew chief, on the signature line in Section Two.

Stewart explains away these anomalies by claiming he was a "temporary" ESS member for purposes of the August 9 race and notes that his own signature is actually scribbled onto the document under Jimmy Carr's in Section Two. Defendant claims it was not unusual for Carr's name to appear on this kind of race-related document because Carr traveled with the team's racing trailer, often arriving at racing events early to oversee the preparation of defendant's race car and to complete any required paperwork.

Plaintiffs attempt to rebut this explanation by suggesting Stewart did not add his signature to the ESS Release Carr signed until *after* the fatal collision with Ward Jr. as part of an effort to cover up any irregularities that might be identified during subsequent litigation. In support of this rebuttal, plaintiffs point to careless practices and arguably contradictory testimony from the two primary ESS organizers.

First, plaintiffs point to the deposition testimony of ESS Vice President Dean Reynolds ("VP Reynolds"), who testified that he noticed Stewart's signature was missing from the ESS Release just before a pre-race meeting. According to VP Reynolds, he personally "went over to [defendant] on the four-wheeler and made him sign the document" before the race began. Next, plaintiffs contrast VP Reynolds's claim with testimony from ESS President Chuck Miller ("President Miller"), who stated during his own deposition that "[a]t the track [VP Reynolds] will not go around and have people sign memberships. He leaves that up to the payoff girls." According to plaintiffs, President Miller's testimony renders VP Reynolds's explanation just a little too convenient to be believed.

Plaintiffs also emphasize the haphazard way these ESS organizers handled membership paperwork for so-called "temporary" members like Stewart, who did not execute an ESS Release in advance of the racing season but rather showed up to race the same day or night an event was scheduled to take place.  Indeed, President Miller acknowledged that his organization was guilty of this kind of poor recordkeeping, volunteering at his deposition that ESS's insurance carrier had in fact demanded that enforcement of pre-race protocols be "tighten[ed]" up in response to the fatal incident that occurred in this case.

Turning to the CMP Release, plaintiffs contend it suffers from a different but even more obvious infirmity—the version signed by Ward Jr., as a driver, and Mr. Ward, as a team owner, contains *seven* numbered paragraphs while the version Stewart signed contains only *six*.  A comparison of the two documents suggests the paragraph missing from defendant's version of the release is an omission of significance, since it explicitly requires the signatory to acknowledge that he is

> a driver, mechanic, pitcrew or other team member, or other participant engaged in racing, and [ ] am not participating in the EVENT(S) or entering the RESTRICTED AREA for recreational purposes.

Plaintiffs draw attention to the fact that the other names and signatures on the seven-paragraph version Ward Jr. signed—that is, the version which includes the extra language quoted above—are those of other race car drivers who participated in the August 9 race that night.  In contrast, the names and signatures found on the shortened version Stewart signed are limited to people associated with car 14, the number of defendant's race car.  According to plaintiffs, this discrepancy is evidence that the version of the CMP Release

defendant signed did not permit him to actually drive in the race but rather only to enter

certain restricted areas as a member of a sprint car racing team.

Notably, this discrepancy goes more or less unexplained in the record. Corcoran,

CMP's owner/operator, readily testified at his deposition that all drivers who will be racing that

night are supposed to sign the same version of the CMP Release:

> Q.    Would you agree that all racers signing a waiver to race
> Canandaigua Motorsports - - to race at Canandaigua
> Motorsports Park on August 9, 2014, were required to
> execute the same liability waiver with the same terms?
>
> A.    Sure.
>
> Q.    And if you had a liability waiver for a specific race and you
> gave some racers in that race one document to sign and you
> gave other racers in the same race a totally different
> document to sign; would that be a good thing to do or a bad
> thing to do?
>
> A.    We don't do that.

When shown that the version of the August 9, 2014 CMP Release signed by Stewart

differed from the one signed by Ward Jr., Corcoran acknowledged the difference. And while

he speculated that the discrepancy may be attributable to the fact defendant entered through

the track's "VIP Gate," Corcoran nevertheless maintained that CMP required all drivers to

sign the same "insurance form."

In sum, plaintiffs have identified a series of inconsistencies that, taken together, cast

significant doubt on whether the Releases should bar their claims. At the very least, the

parties' conflicting accounts of the documentary evidence are sufficient to preclude any

determination that Stewart is entitled to summary judgment on those issues. These disputes

can be put aside, however, because plaintiffs have pointed to an independent source of state law that resolves the question of whether the Releases should apply in this case.

## B. <u>New York's General Obligations Law</u>

Plaintiffs contend that even if the Releases were properly signed and validly executed by all the relevant parties before the August 9 race, § 5-326 of New York's General Obligations Law operates to nullify them. Stewart, for his part, argues that Ward Jr. is not shielded by § 5-326 because he was not a protected "user" within the meaning of the statute.

Section 5-326 provides that:

> [e]very covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admissions or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

N.Y. GEN. OBLIG. § 5-326.

Enacted in 1976, § 5-326 is "a consumer protection measure based upon an assessment that members of the general public patronizing proprietary recreational and amusement facilities are commonly either entirely unaware of the existence of exculpatory clauses in admission tickets or membership applications or are unappreciative of the legal consequences thereof." <u>Owen v. R.J.S. Safety Equip., Inc.</u>, 572 N.Y.S.2d 390 (N.Y. App. Div. 3d Dep't 1991) (Levine, J., dissenting).

Plaintiffs contend Ward Jr. and Mr. Ward are entitled to invoke § 5-326's protection to invalidate the Releases they signed.  According to them, while Ward Jr. might have dreamed of someday becoming a "professional" race car driver, he was still very much an amateur on August 9.  And because he and his father paid fees to ESS and to CMP for the privilege of participating in the sprint car race in a capacity that is essentially "recreational" in nature, Ward Jr. is therefore a "user" entitled to the protection of the statute.

Stewart responds by arguing that while § 5-326 might shield fee-paying spectators or observers, it does not void a release signed by a fee-paying participant like Ward Jr.  In the alternative, defendant asserts that Ward Jr. did not participate in the August 9 race in a recreational capacity but rather in a profit-seeking capacity which "bore all the hallmarks of professional racing."

With respect to his first contention, Stewart relies on Thomas v. Dundee Raceway Park, Inc., 882 F. Supp. 3d (N.D.N.Y. 1995), to claim there is a bright-line rule that deprives event *participants* like Ward Jr. of § 5-326's protection.  Id. at 36 ("[A] participant is not a 'user' under the statute and is not entitled to its protection." ).[5]  In drawing that distinction between spectators and participants, the Thomas Court relied on two New York cases:  Lago v. Krollage, 554 N.Y.S.2d 633 (N.Y. 2d Dep't 1990) (per curiam) and Howell v. Dundee Fair Ass'n, 73 N.Y.2d 804 (N.Y. 1988) (mem.).

However, a closer look at the facts and reasoning of those two cases reveals there is no such bright-line spectator/participant distinction to be found.  In Lago, the plaintiff brought a wrongful death action as the survivor of a race car mechanic who was struck and killed

---

[5]  Notably, in Thomas the Court nevertheless denied the defendant's bid for summary judgment, concluding the dispute over the plaintiff's status was an issue best left for trial.

while he was working in the "pit area" of a racetrack.  554 N.Y.S.2d at 633.  Months before

his death, the decedent in Lago paid a $55 fee to NASCAR for a special membership and

mechanic's license, which required him to sign a release of liability in exchange for certain

death benefits and for permission to work as a car mechanic during NASCAR events.  Id. at

634.  The evening before the NASCAR race that took his life, the decedent also signed a

separate release before entering the racetrack's pit area in which he expressly acknowledged

the dangers of auto racing.  Id.

　　After his death, the decedent's estate sought to have both of these liability releases

invalidated under § 5-326.  Lago, 554 N.Y.S.2d at 634.  The Appellate Division refused,

reasoning the decedent was not a "user" within the meaning of § 5-326 because he "was not

a patron of the racetrack, but was a licensed mechanic whose purpose and conduct were

designed to further the [racing] enterprise, and who, in that context, participated in a benefits

plan, from which funds were paid to his designated beneficiary." Id. at 635.  The Court of

Appeals later affirmed.  Lago v. Krollage, 78 N.Y.2d 95 (N.Y. 1991) (observing the fee paid

by the decedent was for a NASCAR mechanic's license, not for use of the racetrack).

　　Similarly, in Howell the plaintiff was injured at a racetrack while serving on the

volunteer fire and ambulance crew.  537 N.Y.S.2d at 27.  Although he did not pay any fee to

enter the racetrack, the plaintiff signed a release before he entered the restricted pit

area.  Id.  Under those facts, the Court of Appeals affirmed the lower court's determination

that the Howell plaintiff was not a "user" of the racetrack within the meaning of § 5-326

because he "was at the raceway solely to work as a member of the volunteer fire and rescue

squad," and was not there to be a "user" of the recreational facility itself; i.e., to race on the

racetrack.  Id. at 28.

In other words, the rule that emerges from <u>Lago</u> and <u>Howell</u> does not determine whether someone is a qualifying "user" under § 5-326 by drawing a distinction between spectators and participants but rather does so by asking whether the party seeking to invalidate a release (1) paid a fee for the specific purpose of using the facility (2) in a way that was "recreational," rather than professional, in nature.

Courts take a fairly broad view of what constitutes "recreational" participation for purposes of the statute.  For example, in <u>Owen v. R.J.S. Safety Equip., Inc.</u>, 572 N.Y.S.2d 390 (N.Y. App. Div. 3d Dep't 1991), a case decided after <u>Lago</u> and <u>Howell</u>, the Appellate Division affirmed the trial court's conclusion that § 5-326 invalidated two liability releases signed by a driver who was killed when he lost control of his race car and struck the perimeter wall of the track.  <u>Id</u>. at 391.

Much like Ward Jr., the decedent in <u>Owen</u> paid two fees and signed two liability releases before his accident:  first, he paid a membership fee to Drivers Independent Race Tracks, Inc. ("DIRT"), an organization similar to ESS; and second, he paid an additional fee to the racetrack to participate in a specific event being held there.  572 N.Y.S.2d at 392-93.

The <u>Owen</u> Court rejected arguments similar to those made by Stewart.[6]  First, the Court observed that "it seems only logical to conclude that one who drives a race car at such an establishment is ordinarily a user of the facility within the meaning of the statute."  572 N.Y.S.2d at 393.  Second, the Court concluded the record demonstrated that decedent

---

[6] Stewart contends much of <u>Owen</u>'s relevant analysis is dicta.  Defendant is correct to claim the Appellate Division in <u>Owen</u> noted that the defendants' challenge to § 5-326's applicability was not properly raised in the trial court.  Nevertheless, the <u>Owen</u> Court chose to engage in a well-reasoned discussion that sheds light on how to evaluate who qualifies as a "user" under the state law in question.  That reasoning will be considered here for its persuasive value.

"pursued the sport of auto racing as a hobby or avocation, not as a business or

vocation."  Id.  In reaching that latter conclusion, the Court specifically noted that

> Although he occasionally won trophies, decedent had no net
> earnings from racing, and there is no evidence that decedent was
> entitled to share in any of the proceeds of the DIRT-sponsored
> races.  Nor is there evidence that decedent's membership in DIRT
> was for any purpose other than to gain entry to the track so that he
> could pursue auto racing as a hobby or recreational activity . . . . Nor
> should decedent's 19 years of experience as a race driver preclude
> application of [§ 5-326].  Any user who pursues a recreational
> activity for 19 years is likely to become well familiar with the risks
> associated with that activity, but the statute contains no distinction
> between experienced and inexperienced users."

Owen, 572 N.Y.S.2d at 393-94 (emphasis added).  The Court of Appeals later affirmed

without reaching the § 5-326 issue.  79 N.Y.2d 967.

More recently, in O'Connor v. U.S. Fencing Ass'n, 260 F. Supp. 2d 545, 551 (E.D.N.Y.

2003), the Court applied Owen's reasoning to invalidate two liability releases signed by the

plaintiff, a competitive fencer who suffered a serious knee injury during a fencing event.  Like

the plaintiff in Owen, the plaintiff-fencer in O'Connor first paid a membership fee and signed

a liability waiver to join the U.S. Fencing Association ("USFA").  Id. at 547.  Later, the fencer

paid a "separate and independent fee" to participate in a National Championship competition

sponsored by the USFA.  Id. at 551.

During one of the event's matches, a negligently prepared competition surface caused

the plaintiff to lose her footing, resulting in severe injuries to her knee.  O'Connor, 260 F.

Supp. 2d at 548.  When she sued USFA, the organization moved for summary judgment on

the basis of the two liability waivers signed by the plaintiff, who countered by asserting the

waivers were invalid under § 5-326.  Id. at 549.  The O'Connor Court agreed with the plaintiff,

holding that both waivers were unenforceable under New York law.  Id. at 559 ("New York

GOL § 5-326 applies here and voids the waivers on which USFA relies.").

Beyond Owen and O'Connor, the "fee/no fee" and "professional/amateur" distinctions

found in § 5-326's case law are recurring and consistent.  See, e.g., Scrivener v. Sky's the

Limit, Inc., 68 F. Supp. 2d 277, 281 (S.D.N.Y. 1999) (finding § 5-326 inapplicable because

plaintiff injured while skydiving had paid the fee for "instructional and not recreational"

purpose); Lux v. Cox, 32 F. Supp. 2d 92 (W.D.N.Y. 1998) (affirming conclusion that § 5-326

was inapplicable because plaintiff injured during collision on a race track at a high-speed

driving school program was participating in an "instructional sporting activity" rather than a

recreational one); Mc Duffie v. Watkins Glen Int'l, Inc., 833 F. Supp. 197, 202 (W.D.N.Y.

1993) (declining to apply § 5-326 where plaintiff was "an experienced participant who made

his living from racing" rather than a "patron user of the recreational establishment"); Garnett

v. Strike Holdings LLC, 882 N.Y.S.2d 115 (N.Y. App. Div. 1st Dep't 2009) (applying § 5-326

where plaintiff paid a fee to use the recreational facility); Fazzinga v. Westchester Track

Club, 851 N.Y.S.2d 278 (N.Y. App. Div. 2d Dep't 2008) (declining to apply § 5-326 to

recreational runner who collapsed due to cardiac event held on university campus because

he was not specifically "patronizing a proprietary recreational or amusement facility").

When those recurring distinctions are applied to the facts of this case, it makes sense

to conclude that § 5-326 invalidates both of the Releases.  Among other things, the parties

acknowledge that Ward Jr. and Mr. Ward paid a membership fee to ESS in exchange for

permission to race in ESS-sponsored sprint car events like the August 9 race.  Importantly,

this ESS membership, whether paid in advance or waived as part of a "gentleman's

agreement" for temporary members, was a technical prerequisite to being permitted to race

in any ESS-sponsored events.[7]  In addition, racers paid a separate fee to Corcoran, CMP's owner/operator, in exchange for permission to make use of the track itself.  As VP Reynolds explained in his deposition, "it's the only sport where the participants have to pay to play."

Finally, the record establishes that, at best, Ward Jr. was the sort of "experienced" recreational user alluded to in <u>Owen</u>.  Mr. Ward, not his son, bankrolled the significant yearly expenditures needed to maintain the racing team while Ward Jr. worked part-time for the family's painting business.  And although Ward Jr. had won cash prizes and other accolades over the years, there is no evidence that he enjoyed any significant net earnings as a direct result.  Nor have the parties identified any professional arrangement he might have had with ESS or CMP, either generally or in connection with the August 9 race in particular.

Simply put, the record establishes that Ward Jr. paid certain fees for the privilege of patronizing a recreational establishment that offered the opportunity to participate in a recreational activity.  To be sure, both Ward Jr. and Stewart were experienced participants in that activity, and by all accounts both men spent enormous amounts of time and money in pursuit of their passion.

But simply spending time and money on a particular hobby does not transmogrify it into a professional endeavor.  As <u>Owen</u> and <u>O'Connor</u> demonstrate, the consumer-protective language of § 5-326 does not distinguish between the experienced and the inexperienced hobbyist.  Indeed, at oral argument Stewart's attorney rejected the notion that defendant's

---

[7]  Indeed, this rigid requirement helps to explain why Stewart and other witnesses have remained adamant about the availability of "temporary" ESS memberships that could be acquired at the last minute, as defendant maintains occurred in his case.

own participation in the August 9 race amounted to anything other than a recreational pursuit. Accordingly, the Releases are unenforceable.[8]

### C. **Primary Assumption of the Risk**

No matter, says Stewart. According to him, the common law rules surrounding assumption of the risk independently necessitate dismissal of plaintiffs' negligence-based claims because serious bodily injury or death resulting from a collision with another driver is an inherent risk of auto racing. Plaintiffs respond that there is a genuine factual dispute over whether defendant's conduct unreasonably increased the risk present in this instance.

A review of the parties' submissions confirms that plaintiffs are correct. Generally speaking, "[a] participant in an athletic or recreational activity assumes known risks and relieves the defendant of any duty to safeguard him from those risks." Zelkowitz v. Country Grp., Inc., 36 N.Y.S.3d 32 (N.Y. App. Div. 1st Dep't 2016) (citing Trupia v. Lake George Cent. Sch. Dist., 901 N.Y.S.2d 127 (N.Y. 2010)).

"However, a participant only consents to 'those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation.'" Zelkowitz, 36 N.Y.S.3d at 32 (quoting Morgan v. State of N.Y., 662 N.Y.S.2d 421 (N.Y. 1997)). In other words, the doctrine "will not serve as a bar to liability if the risk is unassumed, concealed, or unreasonably increased." Miskanic v. Roller Jam USA, Inc., 898 N.Y.S.2d 180, 181-82 (N.Y. App. Div. 2d Dep't 2010); see also Morgan, 662 N.Y.S.2d 421 ("[P]articipants will not be deemed to have assumed the risks of reckless or intentional conduct or concealed or unreasonably increased risks.").

---

[8] Stewart's counterclaim is based on language in these unenforceable documents. Accordingly, it must be dismissed.

That is precisely the factual dispute at issue here. Stewart contends that the risk of being in a dangerous collision is inherent in the sport of sprint car racing and that Ward Jr., an experienced participant, knew full well that bodily injury or even death might result if such a crash were to occur. Further, defendant testified at his deposition that drivers with disabled race cars would typically wait in their cars for a safety crew to arrive, testimony which paints Ward Jr.'s conduct in this case as completely unreasonable in light of the known risks.

But plaintiffs assert that this is an unduly abstract characterization of what occurred in this case. Among other things, they identify deposition testimony from fellow racers Hebing and Zemken-Friesen which indicates it was somewhat common for a sprint car racer to exit a disabled car, whether to avoid fire hazards or simply because they were "mad at people" who might have caused them to crash. Further, plaintiffs point out that emergency and rescue crews will sometimes walk around on the track during caution periods following an accident, a claim bolstered by the near-immediate emergency response reflected on the video submitted by plaintiffs.

Most importantly, though, plaintiffs emphasize two things which distinguish the collision in this case from the sort of general "risk of deadly vehicular crash" argument being made by Stewart in support of his motion. First, plaintiffs' evidence is sufficient to conclude that racers are expected to behave quite differently during a "caution" period than during regular racetime action—they are instructed to slow down, move away from the crash, and be mindful of the fact that unexpected persons, including emergency responders, might be hurrying onto the track. Second and relatedly, plaintiffs' evidence permits a finding that defendant failed to adhere to those instructions, instead turning and accelerating his car toward Ward Jr., who was standing on the track.

Therefore, even assuming Ward Jr.'s decision to walk onto the track's driving area while the race was under a "caution" heightened his own risk of injury, it does not follow that this conduct gave other participants in the race, such as Stewart, *carte blanche* to act unreasonably in response. Accordingly, the question of whether or not Ward Jr. assumed the risk of defendant's actions cannot be resolved at this juncture. McGrath v. Shenendehowa Cent. Sch. Dist., 906 N.Y.S.2d 399, 401 (N.Y. App. Div. 3d Dep't 2010) ("The application of the doctrine of assumption of risk is generally a question of fact to be resolved by a jury.").

### D. Pre- and Post-Impact Damages

Finally, Stewart seeks dismissal of plaintiffs' pre-impact terror and post-impact conscious pain and suffering claims. According to defendant, (1) there is no evidence to substantiate any pre-impact terror and (2) it is undisputed that Ward Jr. died without ever regaining consciousness. Plaintiffs concede the sequence of events occurred quickly but argue that the video evidence and other evidence raise triable issues of fact.

"Damages for preimpact terror are designed to compensate the decedent's estate for the fear the decedent experienced during the interval between the moment the decedent appreciated the danger resulting in the decedent's death and the moment the decedent sustained a physical injury as a result of the danger. There must be some evidence that the decedent perceived the likelihood of grave injury or death before the impact, and suffered emotional distress as a result." In re 91st Street Crane Collapse Litig., 62 N.Y.S.3d 11, 21 (N.Y. App. Div. 1st Dep't 2017).

"In determining damages for conscious pain and suffering experienced in the interval between injury and death, when the interval is relatively short, the degree of consciousness,

severity of pain, apprehension of impending death, along with duration, are all elements to be considered." In re 91st Street Crane Collapse Litig., 62 N.Y.S.3d at 21.

"Plaintiffs have the threshold burden of proving consciousness for at least some period of time following an accident in order to justify an award of damages for pain and suffering. The burden can be satisfied by direct or circumstantial evidence. However, mere conjecture, surmise or speculation is not enough to sustain a claim for pain and suffering damages. Without legally sufficient proof of consciousness following an accident, a claim for conscious pain and suffering must be dismissed." Cummins v. Cnty. of Onondaga, 84 N.Y.2d 322, 324-25 (N.Y. 1994).

Plaintiffs rely on their video evidence to claim Ward Jr. "raised his arms in a defensive posture" and made at least some attempt to avoid the impact. Plaintiffs have also submitted an affidavit from Joseph P. Wesley, an eyewitness seated in the bleachers during the race, to further substantiate their assertion that Ward Jr. realized the danger and made at least some attempt to avoid the collision.

In addition, plaintiffs argue the video evidence shows that Ward Jr. "jumped upon impact," causing only his lower body to be hit initially. So while plaintiffs concede that the time between this initial impact and Ward Jr.'s eventual death was likely only "seconds," they nevertheless contend Ward Jr. suffered, at the very least, conscious pain in his lower body as he was thrown into the air.

Stewart rebuts these assertions by pointing to various pieces of forensic and other documentary evidence, claiming this material is decisively more valuable than plaintiffs' video evidence.

In essence, the parties' briefing demonstrates a basic disagreement about how the video evidence of the collision should be assessed in the current procedural posture, a point at which the Court is essentially tasked with deciding whether or not the case should go to a jury. See, e.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (Cardamone, J.) (emphasizing that "the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried").

A similar evidentiary issue came up earlier this year before this Court in Hulett v. City of Syracuse, 253 F. Supp. 3d 462 (N.D.N.Y. 2017), a civil rights action where bus surveillance tapes and a booking video played a central role on cross-motions for summary judgment. In that case, the parties essentially invited this Court to make factual determinations about the contested material by deciding which of the parties' competing characterizations of the video evidence should be credited.

This Court declined that invitation, observing that although it may be proper to grant a summary judgment motion "in cases where a video unambiguously reduces one party's version of events to little more than 'visible fiction,'" courts must always be careful to "resist the temptation to uncritically assume that video evidence possesses a unique kind of 'reliable factual conclusiveness.'" Hulett, 253 F. Supp. 3d at 481 (citations omitted).

Admittedly, the Stewart–Ward Jr. situation is a little different. Rather than directly urge the resolution of competing characterizations of the material in favor of one party or the other, Stewart appears to insist that video of the collision is somehow devoid of any value in deciding whether Ward Jr. might have experienced certain forms of harm.

But while that argument may be somewhat distinguishable from the ones advanced by the parties in Hulett, it must still be rejected.  Instead, the best approach in this case is to embrace "the general principle that, in the ordinary case, the appropriate course of action is still to permit the jury an opportunity to 'resolve the competing versions of events, *in conjunction with the video*, through the ordinary fact-finding processes in which juries engage:  evaluating credibility, drawing inferences from everything th[ey] have seen and heard, and deciding what all the evidence 'means' and what it reveals about what happened.'"  Hulett, 253 F. Supp. 3d at 482 (quoting Howard M. Wasserman, Video Evidence & Summary Judgment: The Procedure of Scott v. Harris, 91 Judicature 180, 184 (2008)).

In other words, because the parties' disputes about the harm Ward Jr. suffered boils down to two competing characterizations of the whole body of evidence available in this case, Stewart's motion for summary judgment on these items of damages must be denied.

## IV.  CONCLUSION

Section 5-326 protects Ward Jr., an experienced-but-still-amateur driver who paid fees to ESS and CMP in exchange for a chance to race at the Canandaigua track for fun, not profit.  This conclusion mandates dismissal of Stewart's counterclaim, which is based on language found in those now-invalidated agreements.

Beyond that, the assumption-of-risk as a matter of law argument made by Stewart must be denied because there are genuine factual disputes over whether, and to what extent, defendant's conduct during the caution period of the race may have unreasonably increased the risk that Ward Jr. assumed.  As for plaintiffs' damages claims, it is

inappropriate to attempt to draw factual conclusions from competing evidence at the summary judgment stage.  In sum, plaintiffs' claims are best left to a jury.

Therefore, it is

ORDERED that

1.  Defendant Anthony Wayne Stewart's motion for partial summary judgment is DENIED;

2.  Plaintiffs Kevin A. Ward, Sr. and Pamela Ward's cross-motion for partial summary judgment is GRANTED; and

3.  Defendant Anthony Wayne Stewart's counterclaim is DISMISSED.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  December 12, 2017
        Utica, New York.