UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEVIN A. WARD, SR. and
PAMELA WARD, individually
and as Administrators of the
Estate of Kevin A. Ward, Jr.,
deceased,

                          Plaintiffs,


              -v-                                    7:15-CV-1023


ANTHONY WAYNE STEWART,

                          Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

THE LANIER LAW FIRM                         JUDSON A. WALTMAN, ESQ.
Attorneys for Plaintiffs                    BENJAMIN T. MAJOR, ESQ.
6810 FM 1960 Road West
Houston, TX 77069

THE LANIER LAW FIRM                         EVAN M. JANUSH, ESQ.
Attorneys for Plaintiffs                    RICHARD D. MEADOW, ESQ.
126 East 56th Street, 6th Floor             WILLIAM M. LANIER, ESQ.
New York, NY 10022                          ZARAH LEVIN-FRAGASSO, ESQ.

WOODS OVIATT GILMAN LLP                     BRIAN D. GWITT, ESQ.
Attorneys for Defendant
350 Main Street, Suite 1900
Buffalo, NY 14202

ICE MILLER LAW FIRM                         ANGELA P. KRAHULIK, ESQ.
Attorneys for Defendant                     ERIC J. MCKEOWN, ESQ.
One American Square, Suite 2900             RICHARD A. SMIKLE, ESQ.
Box 82001
Indianapolis, IN 46282

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION and ORDER**

## I. INTRODUCTION

Plaintiffs Kevin A. Ward, Sr. and Pamela Ward (collectively "plaintiffs") filed this wrongful death action in state court after defendant Anthony Wayne Stewart ("Stewart" or "defendant") struck and killed their son, Kevin A. Ward, Jr. ("Ward"), during a sprint car race.

Stewart removed plaintiffs' suit to federal court and asserted an indemnification counterclaim based on two liability releases (the "Releases"). Defendant then tried, and failed, to have the case transferred to the United States District Court for the Western District of New York, Rochester Division. Ward v. Stewart, 133 F. Supp. 3d 455 (N.D.N.Y. 2015).

Thereafter, the parties completed fact discovery and Stewart moved for partial summary judgment. Although he did not challenge plaintiffs' claims alleging reckless or intentional conduct, defendant argued that any negligence-based causes of action were barred by the Releases or, alternatively, by the doctrine of primary assumption of risk.

Plaintiffs opposed Stewart's partial summary judgment motion and cross-moved seeking dismissal of defendant's counterclaim for indemnification. According to plaintiffs, the Releases on which this counterclaim relied were either inapplicable to the particular facts of this case or completely unenforceable as a matter of state law.

On December 12, 2017, a Memorandum–Decision & Order resolved these issues. Ward v. Stewart, –F. Supp. 3d–, 2017 WL 6343534 (N.D.N.Y. Dec. 12, 2017) (the "December Order" or the "Order"). As relevant here, the December Order invalidated the Releases, dismissed Stewart's counterclaim, and concluded that disputed issues of fact precluded resolution of defendant's assumption-of-risk defense without the aid of a jury.

On December 22, 2017, Stewart moved pursuant to 28 U.S.C. § 1292(b) seeking to certify certain portions of the December Order for interlocutory appeal or, in the alternative, for the entry of partial final judgment on his now-dismissed counterclaim pursuant to Federal Rule of Civil Procedure ("Rule") 54(b).  Plaintiffs opposed.  The motion has been fully briefed and will be decided on the basis of the submissions without oral argument.

## II. <u>DISCUSSION</u>[1]

Stewart contends this Court should sanction an immediate appeal from the December Order principally because its holding upsets "decades of uniform and consistent law in New York accepting the validity of releases signed by automobile racing participants."  Def.'s Mem. at 5.[2]  As he tells it, the Order threatens to end "the entire automobile racing industry in the State of New York."  <u>Id</u>.

This hyperbolic account of the possible ramifications of the December Order on New York motorsports is apparently borne of necessity—Stewart's decision to remove this litigation from state court prevents him from taking an immediate appeal unless he can demonstrate the existence of certain, "exceptional" circumstances.

Unlike civil practice in many state courts, federal appellate jurisdiction is generally limited to review of only the "final decisions" of the district courts.  <u>Compare</u> <u>Cobbledick v. United States</u>, 309 U.S. 323, 324 (1940) ("Finality as a condition of review is an historic characteristic of federal appellate procedure."), <u>and</u> <u>Koehler v. Bank of Bermuda Ltd.</u>, 101 F.3d 863, 865 (2d Cir. 1996) ("It is a basic tenet of federal law to delay appellate review until

---

[1]  A thorough recitation of the facts giving rise to plaintiffs' claims is set forth in the December MDO, <u>Ward</u>, 2017 WL 6343534 at *1-*4, and the parties' familiarity with that background material is assumed for purposes of resolving this motion.

[2]  Pagination corresponds to CM/ECF.

a final judgment has been entered."), with Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc., 71 F. Supp. 2d 139, 150 (E.D.N.Y. 1999) (Weinstein, J.) ("In New York, for example, a party can appeal almost any interlocutory trial court order that relates to the merits of the case or that affects a substantial right."), and Richard C. Reilly, Practice Commentaries, C5701:1, N.Y.C.P.L.R. § 5701 ("[A]s a general rule almost anything can be appealed to the appellate division . . . .") (McKinney's 2015).

"This final-judgment rule, now codified in [28 U.S.C. § 1291], preserves the proper balance between trial and appellate courts, minimizes the harassment and delay that would result from repeated interlocutory appeals, and promotes the efficient administration of justice." Microsoft Corp. v. Baker, 137 S. Ct. 1702, 1712 (2017) (citing Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 374 (1981)); see also Nat'l Asbestos Workers Med. Fund, 71 F. Supp. 2d at 149 (observing that the final-judgment rule preserves, inter alia, "the distinct and vital role of the trial judge in the federal system").

"In § 1291 Congress has expressed a preference that some erroneous trial court rulings go uncorrected until the appeal of a final judgment, rather than having litigation punctuated by 'piecemeal appellate review of trial court decisions which do not terminate the litigation.'" Fischer v. N.Y. State Dep't of Law, 812 F.3d 268, 273 (2d Cir. 2016) (quoting United States v. Hollywood Motor Car Co., 458 U.S. 263, 265 (1982)).

But as with nearly every rule, there are exceptions.  Stewart identifies two as being relevant in this case:  Section 1292(b)'s procedure for certifying a nonfinal order for interlocutory appeal and/or the entry of partial final judgment under Rule 54(b).[3]

## A. Section 1292(b)

In 1958, Congress created a "procedure for establishing appellate jurisdiction to review nonfinal orders in civil actions."  Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b), 88 HARV. L. REV. 607, 609 (1975).

As relevant here, the statutory enactment vests a district court with discretion to certify an order in a civil action for immediate appeal if (1) it "involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion" and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).

"[T]he proponents of an interlocutory appeal have the burden of showing that all three of the substantive criteria are met."  In re Facebook, Inc., IPO Sec. & Derivative Litig., 986 F. Supp. 2d 524, 529 (S.D.N.Y. 2014) ("In re Facebook").  However, "even where the three legislative criteria of [§ 1292(b)] appear to be met, district courts retain 'unfettered discretion to deny certification' if other factors counsel against it."  Id. (quoting Transp. Workers Union of Am., Local 100, AFL-CIO v. N.Y. City Transit Auth., 358 F. Supp. 2d 347, 351 (S.D.N.Y. 2005)).

---

[3]  "Though the mechanics of the two procedures are different, their primary purposes are identical:  to accelerate appellate review of select portions of a litigation."  Local P-171 Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Thompson Farms Co., 642 F.2d 1065, 1071 (7th Cir. 1981).

As courts have repeatedly observed, § 1292(b) "was not intended to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation or to be a vehicle to provide early review of difficult rulings in hard cases." Primavera Familienstifung v. Askin, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001) (internal citation and quotation marks and citation omitted). Instead, "[c]ertification is only warranted in 'exceptional cases,' where early appellate review 'might avoid protracted and expensive litigation.'" Id.

Stewart contends two issues[4] warrant § 1292(b) certification:

1.    Whether the Court correctly determined that the Releases are unenforceable pursuant to Section 5-326 of New York's General Obligations Law.

2.    Whether the Court correctly denied Stewart's motion for partial summary judgment as to Plaintiffs' negligence claims, based on its finding that there were questions of fact regarding Ward, Jr.'s assumption of the risk.

At the outset, these issues do not stand out as the kind of "exceptional" ones seemingly contemplated by § 1292(b). Whether considered individually or in combination, they appear on their face to be precisely the sort of run-of-the-mill litigation disputes that are raised (by parties) and resolved (by trial courts) during the course of nearly any civil matter.

By framing the issues in this way, Stewart signals that his desire for an immediate appeal is based on simple disagreement: either the December Order answered these questions wrong, or that the questions themselves are difficult to answer when applied to the facts of this case.

---

[4] As other courts have noted, § 1292(b) enshrines in the law a procedure by which a district court may certify an "order" for immediate appeal, not just a process for framing individual questions. See, e.g., City of N.Y. v. Beretta U.S.A. Corp., 524 F.3d 384, 391-92 (2d Cir. 2008) ("When a district court certifies, pursuant to 28 U.S.C. § 1292(b), a question of controlling law, the entire order is certified and [the appellate court] may assume jurisdiction over the entire order, not merely over the question as framed by the district court.").

But neither of those arguments are of a type that would ordinarily provide a basis for immediate appeal under § 1292(b).  Weber v. United States, 484 F.3d 154, 159 n.3 (2d Cir. 2007) ("Congress did not intend 28 U.S.C. § 1292(b) to serve an error-correction function."); Williston v. Eggleston, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006) ("Interlocutory appeal was not intended as a vehicle to provide early review of difficult rulings in hard cases . . . . ").

This is because the federal policy restricting interlocutory appeals to only truly "exceptional" situations aligns with a simple reality:  even incorrectly decided, a nonfinal order partially denying summary judgment—like the December Order at issue here—is generally of no immediate consequence to anyone other than the parties themselves.  See, e.g., Camreta v. Greene, 563 U.S. 692, 709 n.7 ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."); Oneida Indian Nation of N.Y. v. Pifer, 840 N.Y.S.2d 672, 674 (N.Y. App. Div. 3d Dep't 2007) ("Federal court rulings on issues of state law are not binding on state courts.").

### 1. The Releases

In other words, even assuming the December Order overlooked, failed to apply, (or, as Stewart's moving papers suggest, *disregarded*), a "well-established exception" to the applicability of § 5-326 of New York's General Obligations Law, then the Order itself poses no danger at all—other courts considering the issue will surely locate the exception and are free to apply it in appropriate cases.  Cf. Transp. Workers Union of Am., Local 100, AFL-CIO, 358 F. Supp. 2d at 354 ("Certification is to be reserved for the exceptional case in which the law is fundamentally uncertain.").

The bigger problem for Stewart's argument, though, is that no such blanket "motorsports-participation" exception to § 5-326 exists.  Among other things, a party seeking § 1292(b) certification may demonstrate there is "substantial ground for difference of opinion" on a controlling question of law by showing "there is genuine doubt as to whether the district court applied the correct legal standard in its order."  In re Facebook, 986 F. Supp. 2d at 540.

In order to make this determination, "the district court must analyze the strength of the arguments in opposition to the challenged ruling in order to determine whether the issue for appeal is truly one on which there is a substantial ground for dispute."  Jackson v. Caribbean Cruise Line, Inc., 88 F. Supp. 3d 129, 142 (E.D.N.Y. 2015) (citation and internal quotation marks omitted).

That analysis begins, again, with the language of the relevant provision itself.  Section 5-326 of New York's General Obligations Law provides that:

> [e]very covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admissions or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

N.Y. GEN. OBLIG. § 5-326.

Plaintiffs' contention then, as now, was that they were entitled to invoke this consumer protection provision to invalidate the Releases because Ward qualified as a fee-paying

- 8 -

recreational "user" of the racetrack.  Stewart, for his part, argued then, as he does now, that § 5-326 protected spectators or observers but not participants, at least when applied to liability releases in the auto racing context.

Stewart's principal legal support for the existence of this spectator/participant distinction came from clear language in <u>Thomas v. Dundee Raceway Park, Inc.</u>, 882 F. Supp. 34 (N.D.N.Y. 1995), a case in which this Court stated that "a participant is not a 'user' under [§ 5-326] and is not entitled to its protection."  <u>Id</u>. at 36.

As far as Stewart is concerned, the December Order's analysis of the "user" issue should have stopped right there.  However, plaintiffs' memorandum in opposition to defendant's bid for partial summary judgment argued that New York courts routinely applied § 5-326 to shield fee-paying *participants* in recreational activities, too.

To resolve the parties' dispute over the statute's possible applicability to the facts of plaintiffs' case, the December Order examined the state decisional law on which <u>Thomas</u>'s unequivocal pronouncement was based to determine whether it was, in fact, a correct statement of the law.

The December Order concluded it was not.  By way of review, the Order found that in <u>Thomas</u> the Court had relied on two New York cases to draw a bright-line distinction between spectators and participants:  <u>Lago v. Krollage</u>, 554 N.Y.S.2d 633 (N.Y. App. Div. 2d Dep't 1990) (per curiam) and <u>Howell v. Dundee Fair Ass'n</u>, 73 N.Y.2d 804 (N.Y. 1988) (mem.).

In <u>Lago</u>, a race car mechanic was struck and killed while he was working in the "pit area" of a racetrack.  554 N.Y.S.2d at 633.  After his death, the mechanic's estate sought to have the liability releases he signed invalidated under § 5-326.  <u>Id</u>. at 634.  But the Appellate Division refused, reasoning the mechanic was not a "user" within the meaning of § 5-326

because he "was not a patron of the racetrack, but was a licensed mechanic whose purpose and conduct were designed to further the [racing] enterprise." Id. at 635. The New York Court of Appeals later affirmed. Lago v. Krollage, 78 N.Y.2d 95 (N.Y. 1991) (observing the fee paid by the decedent was for a mechanic's license, not for use of the racetrack).

In Howell, a volunteer firefighter was injured at a racetrack while serving on a fire and ambulance crew. 537 N.Y.S.2d at 27. The plaintiff did not pay a fee to enter the racetrack, but he did sign a release before he entered the pit area. Id. Under those facts, the New York Court of Appeals affirmed the lower court's determination that the plaintiff-firefighter was not a "user" of the racetrack under § 5-326 because he "was at the raceway solely to work as a member of the volunteer fire and rescue squad." Id. at 28.

The December Order concluded Lago and Howell did not actually draw a bright line between spectators and participants when applying § 5-326. Rejecting Thomas, the Order instead concluded that state courts—including the New York State Court of Appeals—considering the statute's applicability in various contexts were focused on the nature and character of the plaintiff's connection to the activity in question; i.e., whether the party seeking to invoke the statute's protection was a fee-paying recreational participant or just a professional at work.

The December Order supported this conclusion by, inter alia, examining Owen v. R.J.S. Safety Equip., Inc., 572 N.Y.S.2d 390 (N.Y. App. Div. 3d Dep't 1991), a decision specifically analyzing § 5-326's applicability in the recreational motorsports context. In Owen, the Appellate Division affirmed the trial court's conclusion that § 5-326 invalidated two liability releases signed by a driver who was killed when he lost control of his race car and struck the perimeter wall of the track. Id. at 391.

- 10 -

Much like Ward, the decedent in <u>Owen</u> paid two fees and signed two liability releases before his accident:  first, he paid a membership fee to Drivers Independent Race Tracks, Inc. ("DIRT"), an organization similar to ESS; and second, he paid an additional fee to the racetrack to participate in a specific event being held there.  572 N.Y.S.2d at 392-93.

The December Order found relevant two, related statements made by the Appellate Division majority in <u>Owen</u>.  First, the Court in <u>Owen</u> observed that "it seems only logical to conclude that one who drives a race car at such an establishment is ordinarily a user of the facility within the meaning of the statute."  572 N.Y.S.2d at 393.  Second, the Court concluded that decedent "pursued the sport of auto racing as a hobby or avocation, not as a business or vocation."  <u>Id</u>.

In reaching that latter conclusion, the <u>Owen</u> Court specifically noted that:

> Although he occasionally won trophies, decedent had no net earnings from racing, and there is no evidence that decedent was entitled to share in any of the proceeds of the DIRT-sponsored races.  Nor is there evidence that decedent's membership in DIRT was for any purpose other than to gain entry to the track so that he could pursue auto racing as a hobby or recreational activity . . . .  Nor should decedent's 19 years of experience as a race driver preclude application of [§ 5-326].  Any user who pursues a recreational activity for 19 years is likely to become well familiar with the risks associated with that activity, but the statute contains no distinction between experienced and inexperienced users."

<u>Owen</u>, 572 N.Y.S.2d at 393-94.  The New York Court of Appeals later affirmed without reaching the § 5-326 "user" issue.  79 N.Y.2d 967.

In seeking § 1292(b) certification, Stewart accuses the December Order of improperly relying on this language in <u>Owen</u>.  As defendant correctly argued before and now, the portion of the <u>Owen</u> decision that is particularly damaging to him—the Appellate Division's exposition on its view of why the decedent-racer would have quite clearly qualified as a "user"

under § 5-326—happens to be set forth in dicta.  But that is a fact readily recognized in the December Order, which did not treat Owen as binding precedent but rather considered it for its persuasive value.  After all, Owen is nothing if not a statement about the proper scope of a state law provision as understood by one of that state's intermediate appellate courts.

This time around, Stewart also attacks Owen's usefulness by asserting that the New York Court of Appeals' "express refusal to affirm [its] reasoning" is some kind of meaningful signal of disapproval relevant, at least, for § 1292(b) purposes.  Def.'s Mem. at 13.  However, "the silence of an appellate court is not enough to satisfy section 1292(b)."  Garber v. Office of the Comm'r of Baseball, 120 F. Supp. 3d 334, 338 (S.D.N.Y. 2014).

Stewart continues his assault on the December Order's consideration of Owen by offering up Justice Levine's *dissenting* opinion in the case, claiming that the construction of § 5-326 he set forth in dissent later carried the day and became the law in New York State.

As an initial matter, Justice Levine's dissent seems less concerned with carving out the kind of "motorsports exception" to § 5-326 urged by Stewart than it is with drawing a line in the sand between experienced and inexperienced patrons of recreational facilities.  See Owen, 572 N.Y.S.2d at 395 (stating his view that the decedent, "a knowledgeable, experienced participant," was "simply not a member of the class [the statute] was designed to protect").

In any event, Stewart contends that Justice Levine's construction of § 5-326 is "precisely the reasoning that New York state and federal courts have consistently and uniformly relied upon since Owen."  Def.'s Mem. at 14.  But if that were really the case, one would be quick to append to this kind of assertion a string of post-Owen authority repudiating

the Appellate Division majority's approach in favor of a "consistent[ ] and uniform[ ]"

application of Justice Levine's dissenting view.

Stewart did not do that.  Instead, defendant cited for this proposition just one

case—Mc Duffie v. Watkins Glen Int'l, Inc., 833 F. Supp. 197 (W.D.N.Y. 1993).  According to

defendant, Mc Duffie vindicates Justice Levine's dissenting opinion in Owen and recognizes

its status as controlling law.

It does not.  First, a review of Mc Duffie reveals that it cites Justice Levine's Owen

dissent for nearly the same exact proposition for which the December Order cited it—to

borrow language about how § 5-326 came into existence as a consumer protection

measure.  McDuffie, 833 F. Supp. at 202.

And far from vindicating Stewart's uniquely restrictive vision of Justice Levine's

understanding of § 5-326, the Court in Mc Duffie found the statute inapplicable to the facts

presented by reasoning that "[t]he holding in Lago applies as well to a professional race car

driver whose participation in the race was in furtherance of the speedway venture."  Id. at

202; see also id. (characterizing decedent as waiving right to suit in order to "engage in his

profession for profit").

If this is Stewart's best evidence of the purported existence of a "well-settled

motorsports exception," it is wholly unpersuasive.  This is especially so where, as here,

decisional law from over a decade later continues to expressly reject such a crabbed view

of § 5-326's reach.

For instance, in O'Connor v. U.S. Fencing Ass'n, 260 F. Supp. 2d 545 (E.D.N.Y. 2003),

then-Chief Judge Edward Korman of the Eastern District of New York conducted his own

analysis of New York law before concluding that § 5-326 "has been liberally construed to

cover <u>spectators and participants</u> at sporting events and recreational facilities." <u>Id</u>. at 549 (emphasis added).  In fact, <u>O'Connor</u> even cited to <u>Owen</u> (the majority, not the dissent) for the proposition that the statute "applies to [a] <u>participant</u> in [an] <u>auto racing competition</u>." <u>Id</u>. (emphases added).

With all this laid out yet again, it is obvious that Stewart is attempting to fast-track appellate review of a decision that is unfavorable to him, not one that is manifestly incorrect or for which there is "substantial ground for difference of opinion."

In mounting this failed effort, defendant devotes substantial space to faulting this Court for its willingness to revisit the underlying validity of <u>Thomas</u> after it became a disputed issue during the parties' summary judgment briefing.  But there is nothing improper about double-checking the accuracy of a state law rule set forth in a twenty-three-year-old state law diversity case against the state law on which it is ostensibly based.

Stewart also accuses the December Order of being outcome-oriented because it "went to great lengths in an attempt to distinguish" some, but not quite all, of the cases defendant cited in support of his position.  Def.'s Mem. at 12.

Of course, claiming that the December Order failed to be sufficiently thorough in its examination of the relevant decisional law is logically inconsistent with Stewart's displeasure about the fact the Order was too thorough in taking time to look past <u>Thomas</u> and examine state court opinions like <u>Lago</u> and <u>Howell</u>.

More importantly, though, this assertion is also incorrect.  Stewart's instant motion cites seven relevant cases, five of which were explicitly referenced in the December Order.  Of these, four have already been revisited here:  <u>Thomas</u>, <u>Lago</u>, <u>Howell</u>, and <u>Owen</u>.  The fifth is <u>Lux v. Cox</u>, 32 F. Supp. 2d 92 (W.D.N.Y. 1998).  According to the explanatory parenthetical

appended to this case in defendant's briefing, the plaintiffs in <u>Lux</u> were not entitled to invoke § 5-326's protection simply by virtue of their status as participants at the racetrack.  <u>Id</u>. at 99.

That conclusion is not quite right.  At the outset, <u>Lux</u> observed that "courts have focused on the status of the plaintiff at the time of the alleged injury to determine whether he or she was a 'user' of the facility within the meaning of § 5-326."  <u>Id</u>. at 99.  And yes, the Court in <u>Lux</u> stated that "the record is clear that plaintiffs were participants in the PCA Drivers' school program, rather than spectators or patrons of the . . . race course."  <u>Id</u>.

However, <u>Lux</u> did not base its refusal to invalidate the plaintiffs' liability releases on some spectator/participant distinction or on a blanket "motorsports-participant" exception to the applicability of § 5-326.[5]

The Court instead analogized the facts of <u>Lux</u> to <u>Baschuk v. Diver's Way Scuba, Inc.</u>, 618 N.Y.S.2d 428 (N.Y. App. Div. 2d Dep't 1994), a case in which the Appellate Division refused to apply § 5-326 to invalidate a release the plaintiff signed before enrolling in a scuba diving course sponsored by the defendant at its private pool.  <u>Id</u>.

As relevant here, the Court in <u>Baschuk</u> concluded that "defendant's private swimming pool was used for instructional, not recreational or amusement, purposes" and, relatedly, that "the tuition fee paid by the plaintiff for a course of instruction is not analogous to a use fee for recreational facilities contemplated by [§ 5-326]."  618 N.Y.S.2d at 428.

---

[5]  In fact, the <u>Lux</u> Court's string of citations to instances in which the statute was held inapplicable describes the plaintiffs who did not qualify as, respectively, a "professional race car driver," a "mechanic working in [the] pits," and a "volunteer fireman responding to emergency at [the] racetrack," the plaintiffs in three cases already revisited at length here.

On that logic, the Lux Court approved of the magistrate judge's conclusion that § 5-326 did not shield the plaintiff-driver because she was injured during an "instructional sporting activity," and that the fee she paid to participate in that activity was "more analogous" to a tuition fee than to a usage fee for the racetrack itself.  Id. at 99-100.

No one in this lawsuit has ever claimed the sprint car race in this case was an "instructional sporting activity" or that the fees that Ward or plaintiffs paid—either for membership in ESS or for the use of CMP's racetrack on August 9—can fairly be analogized to a "tuition fee."  See Ward, 2017 WL 6343534 at *10 (quoting ESS Vice President as explaining that "it's the only sport where participants have to pay to play").

Admittedly, though, Stewart has identified two decisions that were not individually analyzed in the December Order.  In the first, Stevens v. Payne, 10 N.Y.S.3d 845 (N.Y. Sup. Ct. 2015), the Cortland County Supreme Court refused to apply § 5-326 to invalidate a release signed by a member of a pit crew who fell from the bleachers.  Id. at 846.  The Stevens Court reasoned that "an individual who actually participates in a race-related event is not a user, but rather a participant who is not entitled to protection of the statute."  Id. at 848.

At first blush, Stevens appears to be the kind of authority that finally supports Stewart's claim of a blanket motorsports exception to § 5-326.  But the primary authority Stevens cites for this proposition is Thomas.  As this Court has now twice explained, Thomas was wrong to read a spectator/participant distinction into § 5-326, whether in the motorsports context or otherwise.[6]

---

[6]  If anything, Stevens is notable for what would seem to be a glaring omission of any reference to Justice Levine's allegedly ascendant construction of § 5-326 in Owen.

- 16 -

The other missing case is <u>Knight v. Holland</u>, 51 N.Y.S.3d 749 (N.Y. App. Div. 4th Dep't 2017).  There, the Appellate Division affirmed the trial court's post-trial invalidation of a liability waiver signed by the plaintiff, who was seated in the pit area when he was struck by a race car attempting to back up.  <u>Id</u>.

Stewart claims the Court in <u>Knight</u> "explicitly applied [the] exception [to § 5-326] in the auto-racing context, holding that Section 5-326 voided a release where the plaintiff 'testified at trial that he was a mere *spectator* on the night of the accident, thereby establishing that he was a user entitled to the benefit of section 5-326,' and 'there was no evidence from which the jury could have rationally found that plaintiff was a *participant* in the event.'  (emphasis added)."  Def.'s Mem. at 11 (citing <u>Knight</u>, 51 N.Y.S.3d at 749).

Notably, though, there is more to that quotation.  Read in full, the Appellate Division's conclusion in <u>Knight</u> was that "there was no evidence from which the jury could have rationally found that plaintiff was a participant in the event <u>whose attendance was 'meant to further the speedway venture.'</u>"  <u>Knight</u>, 51 N.Y.S.3d at 749 (citation omitted) (emphasis added).

<u>Knight</u> draws this bolded language from <u>Smith v. Lebanon Valley Auto Racing, Inc.</u>, 563 N.Y.S.2d 335 (N.Y. App. Div. 3d Dep't 1990).  There, the Appellate Division framed the resolution to the "user" issue under § 5-326 as being controlled by whether the plaintiff's attendance at the racetrack was "meant to further the speedway venture" or simply to "permit him to enjoy a place of amusement."  <u>Id</u>.

This distinction points straight back to the rule identified in the December Order, which like <u>Lago</u>, <u>Howell</u>, <u>Owen</u>, and <u>Lux</u> is focused on the nature and character of the fee-paying plaintiff's use of the facility; i.e., whether it is recreational in nature or the kind of professional

- 17 -

involvement that is, for example, "meant to further the speedway venture."  See, e.g., Petrie v. Bridgehampton Rd. Races Corp., 670 N.Y.S.2d 504 (N.Y. App. Div. 2d Dep't 1998) (citing Owen's majority opinion and applying § 5-326 to invalidate release signed by "novice racer [who] paid a fee to enter a race held at the defendant's raceway"); Gilkeson v. Five Mile Point Speedway Inc., 648 N.Y.S.2d 844 (N.Y. App. Div. 3d Dep't 1996) ("Moreover, the record does not support a finding that plaintiff was engaged in the continuing enterprise of the racetrack or to further the speedway venture.").

Stewart's contention that a participant who pays fees to "use" a racetrack for recreational purposes can never qualify as a "user" for purposes of § 5-326 is not supported by state decisional law.  Owen, 572 N.Y.S.2d at 390 ("[I]t seems only logical to conclude that one who drives a race car at [an automobile raceway] is ordinarily a user of the facility within the meaning of [§ 5-326].").

Stewart's continued insistence that there is a narrow carve-out to § 5-326 just for motorsports events, either on the basis of Thomas's errant statement or some theory of *sub silentio* adoption of Justice Levine's dissenting opinion in Owen, is insufficient to create the sort of "exceptional" circumstances warranting immediate appeal.[7]

## 2. Assumption of Risk

Stewart's second argument fares no better.  According to defendant, certification for immediate appeal under § 1292(b) is independently warranted to determine whether the

---

[7]  Stewart also takes aim at the fact that § 5-326's decisional law concerns instances in which liability releases were raised as a shield by the defendant-owner/operator, not a fellow "user" like him.  And that is true.  But the statute, when it is triggered, instructs in unqualified language that an offending release "shall be deemed void as against public policy and wholly unenforceable."  N.Y. GEN. OBLIG. § 5-326.

December Order correctly refused to dismiss plaintiffs' negligence claims as barred by the doctrine of primary assumption of risk.  Def.'s Mem. at 17.

To review, the December Order determined that genuine disputes over the material historical facts surrounding the Ward–Stewart collision prevented the application of defendant's assumption-of-risk defense at the summary judgment stage of this litigation.  McGrath v. Shenendehowa Cent. Sch. Dist., 906 N.Y.S.2d 399, 401 (N.Y. App. Div. 3d Dep't 2010) ("The application of the doctrine of assumption of risk is generally a question of fact to be resolved by a jury.").

As plaintiffs point out, this determination does not present the sort of "controlling question of law" Congress imagined when it enacted § 1292(b).  See, e.g., Harriscom Svenska AB v. Harris Corp., 947 F.2d 627, 631 (2d Cir. 1991) ("Where, as here, the controlling issues are questions of fact, or more precisely, questions as to whether genuine issues of material fact remain to be tried, the federal scheme does not provide for an immediate appeal solely on the ground that such an appeal may advance the proceedings in the district court.").

In fact, Stewart concedes the December Order accurately recited the general state of controlling New York law on the subject.  See, e.g., Def.'s Mem. at 18.  As the Order observed, "[a] participant in an athletic or recreational activity assumes known risks and relieves the defendant of any duty to safeguard him from those risks."  Zelkowitz v. Country Grp., Inc., 36 N.Y.S.3d 32 (N.Y. App. Div. 1st Dep't 2016) (citation omitted); see also Custodi v. Town of Amherst, 957 N.Y.S.2d 268, 269-70 (N.Y. 2012) (noting that a "limited vestige of the [pre-1975] assumption of the risk doctrine . . . survived the enactment of CPLR 1411 as a defense to tort recovery in cases involving certain types of athletic or recreational activities").

Everyone, including Stewart, agrees that this is the case.  And everyone, including defendant, agrees that plaintiffs' claims based on reckless and/or intentional conduct survive the application of this doctrine.  Nevertheless, defendant appears to contend that proper application of this doctrine will always bar any and all manner of negligence claims arising from a recreational or sporting activity.

That is incorrect.  To be sure, the doctrine will *often* or *typically* have the effect of barring negligence-based claims.  This is because, as Stewart correctly claims, a voluntary participant in a sport or recreational activity is deemed to have impliedly consented "to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation."  Pantalone v. Talcott, 861 N.Y.S.2d 166 (N.Y. App. Div. 3d Dep't 2008) (quoting Morgan v. State of N.Y., 662 N.Y.S.2d 421 (N.Y. 1997)).

This "implied consent" means that a defendant, such as a co-participant in an activity like Stewart, is relieved of the ordinary duty of care he might otherwise owe to the plaintiff "[a]part from instances of reckless, intentional, or other risk-enhancing conduct not inherent in the activity."  Kaufman v. Hunter Mountain Ski Bowl, 657 N.Y.S.2d 773 (N.Y. App. Div. 2d Dep't 1997); see also Custodi, 957 N.Y.S.2d at 270 (describing the current iteration of the doctrine "in terms of the scope of the duty owed to a participant"); Goodlett v. Kalishek, 223 F.3d 32, 38 (2d Cir. 2000) (describing this implied consent as an "elimination" of the duty of care otherwise owed).

Importantly, though, the scope of the implied consent created by this doctrine (and the corresponding elimination of the existing duty of care) is not without limit.  New York courts have repeatedly observed that "a participant will not be deemed to have assumed the risk if, due to a defendant's negligence, the risks were unique and resulted in a dangerous condition

over and above the usual dangers inherent in the activity." Connor v. Tee Bar Corp., 755

N.Y.S.2d 489 (N.Y. App. Div. 3d Dep't 2003); see also Elliott v. Club Med Sales, Inc., 2004

WL 541843 at *5 (S.D.N.Y. Mar. 19, 2004) ("The participant does not assume a risk,

however, if the defendant's negligence created a unique and dangerous condition beyond the

usual dangers inherent in the activity.").

This limitation on the scope of a participant's implied consent has been explicitly

reaffirmed by the New York Court of Appeals as recently as 2012. Custodi, 957 N.Y.S.2d at

270 ("[P]articipants are not deemed to have assumed risks resulting from the reckless or

intentional conduct of others, or risks that are concealed or unreasonably enhanced."); see

also Anonymous v. Simon, 2014 WL 819122 at *4 n.2 (S.D.N.Y. 2014) (recognizing that

some pre-Custodi state court decisions may have applied the doctrine more broadly).

It is a limitation that state courts have applied to owners and operators of recreational

facilities. See, e.g., Connolly v. Willard Mountain, Inc., 40 N.Y.S.3d 236 (N.Y. App. Div. 3d

Dep't 2016) (reversing grant of summary judgment where factual questions remained

regarding "whether defendants unreasonably increased the risk" to the plaintiff); Hope v.

Holiday Mountain Corp., 999 N.Y.S.2d 211 (N.Y. App. Div. 3d Dep't 2014) (reversing grant of

summary judgment in negligence action where factual dispute existed regarding "whether the

park's staffing and operation . . . unreasonably increased the risk posed").

It is a limitation that state courts have applied to conduct attributable to a particular

individual. See, e.g., Tauro v. Gait, –N.Y.S.3d–, 2018 WL 795305 (N.Y. App. Div. 4th Dep't

Feb. 9, 2018) (affirming denial of motion to dismiss where plaintiff alleged "negligence and

reckless conduct" attributable to lacrosse coach during practice that fell outside scope of

implied consent to activity); Brown v. Roosevelt Union Free Sch. Dist., 14 N.Y.S.3d 140 (N.Y.

App. Div. 2d Dep't 2015) (refusing to apply doctrine where defendants failed to establish as a matter of law that conduct attributable to the plaintiff's softball coach "did not unreasonably increase the inherent risks of the activity"); Layden v. Plante, 957 N.Y.S.2d 458, 461 (N.Y. App. Div. 3d Dep't 2012) (declining to apply the doctrine as a matter of law where "triable issues of fact [were] presented as to whether the trainer's actions 'unreasonably heightened the risks to which [plaintiff] was exposed' beyond those usually inherent" in the sport); Haider v. Zadrozny, 876 N.Y.S.2d 215, 217 (N.Y. App. Div. 3d Dep't 2009) ("Again, the disputed factual issues bear on whether [the defendant] was driving in a manner that unreasonably increased the risk of injury to plaintiff, and summary judgment should have been denied.").

Indeed, even courts outside New York State understand this to be an appropriate limit on the doctrine's application in New York at the summary judgment stage. Duchesneau v. Cornell Univ., 2012 WL 3104428, at *3 (E.D. Pa. July 31, 2012) ("[T]hese cases have a unifying theme—clear risks that were known yet disregarded by the plaintiff, with no negligence by the defendant that enhanced the risk. In cases where the plaintiff was unaware of the risk, or where the defendant's negligence amplified the risk, summary judgment has not been granted.").

Stewart attempts to avoid these realities by constructing a narrative based on his preferred recitation of the factual circumstances leading to Ward's untimely death:

> The Court correctly noted that "a participant only consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation." (Dkt. 103 at 22.) But there is no dispute that the risk of injury or death due to collision with another driver—particularly where a driver exits his vehicle during an ongoing race and approaches oncoming traffic on foot—is inherent in the [*sic*] sprint car racing (as well as any other form of racing), and Ward, Jr. was well-acquainted with these risks. These risk were both "fully comprehended" and "perfectly

> obvious." *Turcotte v. Fell*, 502 N.E.2d 964, 968 (N.Y. 1986). Accordingly, Ward, Jr.'s participation in the race—including exiting his vehicle and walking onto the hot track—"operate[d] to relieve other participants in the activity of a duty to use reasonable care," and Ward, Jr.'s negligence claims should be barred as a matter of law. *Goodlett v. Kalishek*, 223 F.3d 32, 36 (2d Cir. 2000) (citing *Turcotte*, 502 N.E.2d at 967-68).

Def.'s Mem. at 17-18.

Notably absent from this summary of events is any reference to conduct attributable to Stewart. But it is in large part the dispute over the magnifying effect, if any, of defendant's conduct under the particular circumstances of this case that remains to be tried. Cf. Elliott, 2004 WL 541843 at *6-*7 (finding individual defendant's conduct might have "actually increased Plaintiff's risk of injury" and holding that "there exists a material issue of fact as to whether Plaintiff's conduct falls within the primary assumption of risk doctrine").

In sum, the December Order's refusal to conclude that, as a matter of law, Ward assumed the risk Stewart would turn his race car and accelerate into him while he was standing on the track during a caution period of the race does not present the sort of "exceptional" circumstances warranting § 1292(b) certification.

### B.  Rule 54(b)

Finally, Stewart contends the Court should exercise its authority to enter final judgment on his indemnification counterclaim.

"[I]n the federal district courts, the entry of a final judgment is generally appropriate 'only after all claims have been adjudicated.'" In re Gentiva Sec. Litig., 2 F. Supp. 3d 384, 387 (E.D.N.Y. 2014) (quoting Novick v. AXA Network, LLC, 642 F.3d 304, 310 (2d Cir. 2011)).

However, "[i]n an exception to this general principle, Rule 54(b) gives the district court authority to enter a final judgment as to fewer than all of the claims by or against a given

party, or as to fewer than all of the parties in a multi-party litigation, thereby permitting an immediate appeal before the action is concluding, 'only if the court expressly determines that there is no just reason for delay[.]'" Sec. & Exch. Comm'n v. Frohling, 614 F. App'x 14, 17 (2d Cir. 2015) (summary order) (quoting FED. R. CIV. P. 54(b)).

"The basic purpose of Rule 54(b) is to avoid the possible injustice of a delay in entering judgment on a distinctly separate claim or as to fewer than all of the parties until the final adjudication of the entire case by making an immediate appeal available." Nat'l Asbestos Workers Med. Fund, 71 F. Supp. 2d at 153 (citation omitted).

Importantly, however, "the Second Circuit has counseled that the historic 'policy against piecemeal appeals requires that the court's power to enter such a final judgment before the entire case is concluded . . . be exercised sparingly.'" In re Gentiva Sec. Litig., 2 F. Supp. 3d at 387 (quoting Novick, 642 F.3d at 310).

Accordingly, "certification under Rule 54(b) should be granted only if there are interests of sound judicial administration and efficiency to be served or, in the infrequent harsh case where there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." In re Gentiva Sec. Litig., 2 F. Supp. 3d at 387 (quoting Hogan v. Consol. Rail Corp., 961 F.2d 1021, 1025 (2d Cir.1992)).

The circumstances present in this case do not warrant application of Rule 54(b). Among other things, plaintiffs' claims and the dismissed counterclaim arise from the same common grouping of facts leading up to, and arising from, the Ward–Stewart collision. The dismissal of a single claim in dyadic litigation like this is not the kind of situation ordinarily contemplated by Rule 54(b). See Nat'l Asbestos Workers Med. Fund, 71 F. Supp.

2d at 153 ("Rule 54(b) was promulgated as a method of partially controlling the liberal joinder of claims and parties allowed under the federal rules.").

Further, there is no indication that this is the "infrequent harsh case" that justifies a departure from the "historic federal policy against piecemeal appeals."  Citizens Accord, Inc. v. Town of Rochester, N.Y., 235 F.3d 126, 128 (2d Cir. 2000).  At this point the interests of judicial administration and efficiency are best served by the prompt resolution of this case into a final, appealable judgment.  Cf. Vaad L'Hafotzas Sichos, Inc. v. Kehot Publ'n Soc'y, 2014 WL 1026592, at *2 (E.D.N.Y. Mar. 20, 2014).

     1. **Possibility of a Second Trial**

Stewart's motion repeatedly warns of his plan to appeal regardless of the outcome of the trial this case.  However, the fact that an immediate appeal might prevent the need for a second trial is not by itself sufficient to trigger Rule 54(b).  See In re Gentiva Sec. Litig., 2 F. Supp. 3d at 390 ("The mere potential for duplicative trials should not by itself result in 54(b) certification."); see also Negrete v. Citibank, N.A., 2017 WL 2963493 at *3 (S.D.N.Y. July 11, 2017) (rejecting claim of "unnecessary discovery and trial costs" as justifying Rule 54(b)'s application).

Assuming the parties fail to reach a settlement, Stewart acknowledges a trial is necessary on plaintiffs' claims alleging reckless or intentional conduct.  A trial on those claims would be necessary even if the Releases were to apply, and regardless of whether or not Ward assumed the risk of injury from the collision.

As a practical matter, the risk of a second or "duplicative" trial resulting from the possibility of a successful appeal on these issues is remote absent a jury verdict in plaintiffs' favor on negligence.  Trying all of plaintiffs' claims at once is more economical, and it is also

far more likely to result in either a verdict completely in Stewart's favor or in a mixed award possibly unaffected by the Releases or by the assumption-of-risk defense.

Stewart's assertions to the contrary rely on speculation about what might happen or what the Second Circuit might decide about the issues discussed above.  But even if the Releases were applicable and it later became necessary to reach the question of indemnification, it is far from clear that this result would require the Court and the parties to "duplicate" their efforts by revisiting the factual disputes surrounding the fatal crash itself.  Cf. Harriscom Svenska AB, 947 F.2d at 631 ("It does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case.").  Accordingly, Stewart's motion for the entry of partial final judgment will be denied.

## III.  CONCLUSION

Stewart's motion is denied in all respects.  If it ultimately proves necessary, the issues he has identified, along with any others, can be presented in a unified appeal at the conclusion of this litigation in the trial court.  The jury trial will start on Monday, May 7, 2018 in Utica, New York.[8]

Therefore, it is

ORDERED that

---

[8]  The parties have also cross-moved to preclude the admission of certain expert testimony at trial.  Those motions will be decided in due course.

Defendant Anthony Wayne Stewart's motion for certification and/or entry of partial final judgment is DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  February 26, 2018
        Utica, New York.